**MEDIACOM CORPORATION, Plaintiff,**

**v.**

**RATES TECHNOLOGY, INC., Defendant.**

**Civil Action No. 97–10559–WGY.**

United States District Court,
D. Massachusetts.

April 16, 1998.

20

Steven M. Bauer, Joseph A. Capraro, Robert N. Feldman, Testa, Hurwitz & Thibeault, Boston, MA, for Plaintiff.

Robert M. Asher, Lee C. Bromberg, Robert L. Kann, Erik P. Belt, Bromberg & Sunstein, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

The plaintiff, MediaCom Corporation ("MediaCom"), commenced this declaratory

judgment action seeking a declaration that its Phone Miser product does not infringe patents owned by the defendant, Rates Technology, Inc. ("Rates"). Rates counterclaimed, alleging infringement of both patents.

## BACKGROUND

Rates owns two United States Patents Nos. 5,519,769 ("the '769 patent") and 5,425,085 ("the '085 patent"). The '085 patent claims a device for automatically routing telephone calls to the carrier offering the least expensive rates for each particular call. This device is called a "Least Cost Routing Device." Generically, such a device is referred to as a "call rating device." The '769 patent claims a method for automatically updating the database of calling rates used by such a call rating device. The two patents are directed at minimizing telephone costs by optimizing the rates at which each call is placed.

### A. Procedure: The *Markman* Hearing.

The Federal Circuit and the Supreme Court have recently removed any doubt that the construction of patent claims is a question of law for a court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978–81, 987 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The task of construing claims entirely as matter of law presents some novel challenges to parties and the district courts, however, and thus this case requires some flexibility and experimentation in the adaptation of familiar methods and strategies.

The *Markman* decisions quickly spawned a new species of proceeding in patent cases— the *Markman* hearing. *See* Kenneth R. Amado, *Reforming Jury Practice in Patent Cases: Suggestions Towards Learning to Love Using an Eighteenth Century System While Approaching the Twenty-first Century*, 78 J. Pat. & Trademark Off. Soc'y 345, 346 (1996) ("Suggestion 1: Since the United States Supreme court Has Affirmed Markman, Pray that Trial Judges Decide Claim Construction Using Pre–Trial Markman Hearings"); James M. Amend, Kirkland & Ellis, *Patent Law: a Primer for Federal District Court Judges* 11–12 (1998) (unpublished manuscript); David H. Binney & Toussaint L. Myricks, *Patent Claim Interpretation After Markman—How Have the Trial Courts Adapted?*, 38 Idea 155 (1997) ("*Patent Claim Interpretation After Markman*"); Steven D. Glazer & Steven J. Rizzi, *Markman: The Supreme Court Takes Aim at Patent Juries*, J. Proprietary Rights, May 1996, at 2; Gary M. Hoffman & John A. Wasleff, *A Tale of Two Court Cases: Markman and Hilton–Davis*, Computer Law, June 1996, at 18; William F. Lee, Simona A. Levi–Minzi & Kerry S. Burke, *Markman and Its Progeny, in High Technology Law in the Twenty–First Century*, Proceedings of the Second Annual High Technology Conference 15, 34–37 (Suffolk Univ. Law School, Sept. 26, 1997) ("*Markman and Its Progeny*");[1] William F. Lee & Wayne L. Stoner, *The Role of Expert Witnesses on Liability Issues in Patent Litigation in Light of Markman v. Westview Instruments in Winning Strategies in 423 Winning Strategies in Patent Litigation* 647, 649–86 (Practising Law Institute 1995). These hearings run the gamut from mid-trial sidebar conferences that undergird relevance rulings, *see Eastman Kodak ·Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547 (Fed.Cir.1997) to virtual mini-trials extending over several days and generating extensive evidentiary records.

---

**1.** As noted by Judge Newman in her dissent, *Markman* may require additional, separate evidentiary hearings in a typical patent infringement suit in light of the pivotal role played by claim interpretation. *See Markman*, 52 F.3d at 1008. Indeed, a new type of motion has emerged, which is a hybrid between a motion *in limine* and one for summary judgment .... Evidentiary hearings, or "Markman Trials," to interpret claim language are becoming routine .... The nature and scope of this new breed of hearings has varied considerably. In some cases the courts have opted simply to issue an interpretation on the record; in others there has been a full blown evidentiary hearing to resolve claim construction *per se;* and in other cases still, the court has delayed a determination all the way until the eve before jury instruction. Steven E. Lipman & Janice M. Muller, *The Markman Case, in American Bar Association Intellectual Property Law Section*, Spring 1996, Arlington, Virginia, CLE Program Materials at 523 ("The *Markman* Case"). *Markman and Its Progeny* at 34–35.

*See Neles–Jamesbury, Inc. v. Fisher Controls, Int'l,* 989 F.Supp. 393, 395 (D.Mass. 1998) (Gorton, J.); *Thorn. EMI North America, Inc. v. Intel Corp.,* 936 F.Supp. 1186, 1189 (D.Del.1996); *Chad Industries, Inc. v. Automation Tooling Systems, Inc.,* 938 F.Supp. 601, 604 (C.D.Cal.1996); *Loral Fairchild Corp. v. Victor Co. of Japan Ltd.,* 906 F.Supp. 798, 802 (E.D.N.Y.1995), and 911 F.Supp. 76, 79 (E.D.N.Y.1996); *Graco Children's Products, Inc. v. Century Products Co., Inc.,* No. CIV.A. 93–6710, 1996 WL 421966 (E.D.Pa.1996); *Ethicon Endo–Surgery v. U.S. Surgical Corp.,* 900 F.Supp. 172, 173 (S.D.Ohio, 1995), *aff'd in part, vacated in part, remanded,* 93 F.3d 1572 (Fed.Cir.1996); *Elf Atochem North America, Inc. v. Libbey–Owens–Ford Co., Inc.* 894 F.Supp. 844, 850 (D.Del.1995); N.D. Cal. R. 16–6 to 16–11. *See also Lee's Aquarium & Pet Products, Inc. v. Python Pet Products,* 951 F.Supp. 1469 (S.D.Cal.1997); *P.A.T., Co. v. Ultrak, Inc.,* 948 F.Supp. 1506 (D.Kan.1996); *Moll v. Northern Telecom, Inc.,* No. CIV.A. 94–5451, 1996 WL 11355, at *7 (E.D.Pa. Jan.3, 1996); *Genentech, Inc. v. Novo Nordisk A/S,* 935 F.Supp. 260 (S.D.N.Y.1996), *vacated* 108 F.3d 1361 (Fed.Cir.1997), *reh'g denied* (1997), *cert. denied* —— U.S. ——, 118 S.Ct. 397, 139 L.Ed.2d 310 (1997).

The characterization of claim construction as matter of law, of course, theoretically permits the resolution of these issues at a relatively early stage in the litigation. "From the standpoint of the litigants, earlier is generally better.... The advantage arises from the fact that many patent cases turn on claim interpretation issues." *Patent Claim Interpretation After Markman, supra* at 161. Questions regarding the construction of pat-

ent claims can now safely be addressed in many circumstances prior to the completion of fact discovery, and certainly before trial. In this case, the Court determined that an early *Markman* hearing was a salutary mechanism for narrowing the disputed issues and securing prompt disposition of those matters as to which there were no genuine factual disputes.

Implicit in this approach to the *Markman* hearing is the notion that, like any other determination of a legal rule, such a hearing should take place in the context of conventional motion practice. Only through the use of traditional dispositive motions will the Court remain moored to familiar procedures and standards of decision, and focus on the application of legal rules to discrete factual circumstances. Otherwise, the Court risks crafting elegant, but ultimately useless, statements of claim construction that fail to address the particular controversy before it. Free-standing *Markman* hearings are of little use in actual litigation and may, indeed, run afoul of the "case and controversy" limitation on judicial power expressed in the Constitution. U.S. Const. art. III, § 2.[2]

■ The parties anticipated this Court's need for a procedural vehicle in which to consider their claim construction arguments. MediaCom filed motions for summary judgment based upon its proposed claim constructions; Rates opposed these motions in like manner. As the preceding discussion indicates, the parties' instincts in this regard were sound; indeed, the Rule 56 summary judgment motion is a perfectly appropriate vehicle in which to conduct a *Markman* hear-

2. Since *Markman,* claim construction has most frequently been handled in conjunction with a hearing on a motion for summary judgment. *See Johansson v. Rose Displays, Ltd.,* 924 F.Supp. 328 (D.Mass.1996) (Young, J.) *rev'd on other grounds,* 121 F.3d 727, 1997 WL 437016 (Fed. Cir.1997); *Dow Corning Wright Corp. v. Osteonics Corp.,* 939 F.Supp. 65 (D.Mass.1996) (O'Toole, J.); *ADC Telecommunications, Inc. v. Siecor Corp.,* 954 F.Supp. 820 (D.Del.1997); *Allied Gator, Inc. v. NPK Construction Equipment, Inc.,* 937 F.Supp. 694 (N.D.Ohio 1996); *American Bank Note Holographics, Inc. v. Upper Deck Co.,* 934 F.Supp. 630 (S.D.N.Y.1996); *American Permahedge, Inc. v. Barcana, Inc.,* 105 F.3d 1441 (Fed.Cir.1997); *Calmac Mfg. Corp. v. Dunham–*

*Bush, Inc.,* 929 F.Supp. 951 (E.D.Va.1996); *Ekchian v. Home Depot, Inc.,* 104 F.3d 1299 (Fed. Cir.1997); *General Mills, Inc. v. Hunt–Wesson, Inc.,* 103 F.3d 978 (Fed.Cir.1997); *GMI Holdings, Inc., v. Stanley Door Systems, Inc.,* 943 F.Supp. 1420 (N.D.Ohio 1996); *Lockwood v. American Airlines, Inc.,* 107 F.3d 1565, 41 U.S.P.Q.2d (BNA) 1961 (Fed.Cir.1997); *Moll,* 1996 WL 11355; *R2 Medical Systems, Inc. v. Katecho, Inc.,* 931 F.Supp. 1397 (N.D.Ill.1996); *Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739 (Fed.Cir. 1997); *Ultradent Products v. Life–Like Cosmetics, Inc.,* 924 F.Supp. 1101 (D.Utah 1996). For a full survey of the recent decisions, *see Patent Claim Interpretation After Markman, supra* at 163–83.

ing. *See Markman,* 52 F.3d at 981 ("[Pronouncing the meaning of the patent] ordinarily can be accomplished by the court in framing its charge to the jury, but may also be done in the context of dispositive motions such as those seeking judgment as a matter of law.") With these principles in mind, the Court held a *Markman* hearing—i.e., a hearing on the motions for summary judgment—on December 15, 1997, to afford the parties an opportunity to present arguments directed at the proper construction of the claims contained in the '085 and '769 patents.

Unfortunately, the scheduling of a separate hearing in which to address issues of claim construction appears to have engendered some confusion as to the proper order of analysis in this dispute. In accordance with the model of claim construction laid out in *Markman, see* 52 F.3d at 978–81, 987, the Court expressly limited argument to the claims, specifications, and prosecution history of the patents in suit,[3] declining to entertain any expert testimony, affidavits, or other extrinsic evidence regarding construction of the claims until and unless the Court determined that such evidence would be required.

In so doing, the Court gave practical meaning to the familiar distinction in patent construction between intrinsic and extrinsic evidence, *Markman,* 52 F.3d at 980–81; *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582–85 (Fed.Cir.1996); the former

constituting the public record of the government granted patent monopoly, the latter being of secondary significance and limited utility. The record of the case to this point however, suggests that the parties have conflated such disfavored extrinsic evidence with the helpful, and often necessary, supporting affidavits and other materials contemplated in Rule 56 as the basis for a ruling on summary judgment.

■ In the ordinary summary judgment motion, the parties seek to persuade the court to apply a legal rule—thus clarifying the rule the Court deems controlling—and at the same time seek to establish the presence or absence of a genuine factual dispute, given the rule applied. Patent infringement analysis should be no different except that, because patent claims often implicate technical or highly specialized knowledge, courts will typically require more assistance than they otherwise do in pronouncing the law (claim construction).[4] Once the claims have been construed, however, the arguments as to disputes of fact (infringement), proceed in the customary manner. The two questions need not be procedurally separated, but the analytic distinction must be maintained.

■ Thus there is no reason to receive "expert opinion" by way of affidavits or testimony on the question of claim construction. Indeed, the central teaching of the Supreme

---

**3.** Specifically, the Court ordered

"Mr. Joel will not testify in the *Markman* hearing in any respect. In fact, no one will testify unless the Court so orders. The *Markman* hearing will proceed as follows: 1. Argument concerning the claims themselves. If the matter is not resolved, then 2. Argument concerning the file wrapper. If the matter is not resolved, then affidavits from alleged experts, not Mr. Joel, and argument thereon. Only if the matter is not by then resolved will the Court entertain oral testimony."

Order of Nov. 12, 1997 (denying defendant's Motion to Compel Deposition, Docket No. 37). In addition to studying the language of the patent itself, a court "should also consider the patent's prosecution history, if it is in evidence" *Markman,* 52 F.3d at 980. While this Court acknowledges the value of prosecution history, it also finds the *Markman* court's statutory interpretation analogy to be extremely helpful in guiding this inquiry. If the prosecution history is analogous to legislative history, its most useful role lies

in the explication of ambiguous or contradictory language within the patent, and not in the construction of meaning independent from the text itself. It is axiomatic that the prosecution history "cannot 'enlarge, diminish or vary' the limitations in the claims." *Markman,* 52 F.3d at 980 (quoting *Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 227, 26 L.Ed. 149 (1880)). For that reason, the Court has endeavored to understand the language of the claims in light of the specification first, and only then consider whether the prosecution history confirms or calls into question that understanding. The Court has, in this spirit, given due consideration to relevant and helpful references to the prosecution history. *Cf. Johansson,* 924 F.Supp. at 328.

**4.** A court is ordinarily expected to supply its own "expertise" in construing written documents, such as contracts and statutes, because these matters are within the special purview of lawyers. In the construction of even relatively simple patent claims, however, the judge may labor in the unaccustomed role of the layman.

Court in *Markman* was that "judges, not juries, are the better suited to find the acquired meaning of patent terms." *Markman,* 517 U.S. 370, 116 S.Ct. at 1395, 134 L.Ed.2d 577. The assistance of skilled and knowledgeable artisans, of course, may prove invaluable in educating the judge in the nuances of the "underlying technology." The Federal Circuit's recent decision in *Fromson v. Anitec Printing Plates, Inc.,* 132 F.3d 1437 (Fed.Cir.1997), illustrates an appropriate use of such assistance. In *Fromson,* the district court relied on experts to explain the process of forming a thin aluminum oxide coating on printing plates by using electrochemical anodization. The Federal Circuit held that such resort to extrinsic evidence was appropriate. The testimony enabled the district court to understand the anodization process to such an extent that it was able to construe the claims. As the Federal Circuit noted, "[p]atent specifications are written for persons of skill in the technical field, not for laymen." *Id.* at 1442.

But the information such sources provide is more analogous to material supporting a ruling on the admissibility of evidence than to testimony before a finder of fact. *Cf. Charlton Mem. Hosp. v. Sullivan,* 816 F.Supp. 50, 53 (D.Mass.1993).[5] Even the most learned expert cannot supplant the Court in its task of interpreting the written document. Nor can the Court simply choose from among the proffered interpretations without conducting its own independent analysis firmly grounded in an adequate understanding of the subject matter of the patent. "The district court's claim construction, enlightened by such extrinsic evidence as may be helpful, is still based upon the patent and

prosecution history. It is therefore still construction, and is a matter of law subject to *de novo* review." *Markman,* 52 F.3d at 981. Moreover, the use of extrinsic evidence will seldom be appropriate unless the terms of the claim in question are technical or highly specialized. *See Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211, 1216 (Fed.Cir. 1995); *Nova Biomedical Corp. v. i-STAT Corp.,* 980 F.Supp. 614, 616 (D.Mass.1997) (Stearns, J.).

In a similar vein, the evidentiary record regarding infringement should be focused primarily on the structure and function of the accused device. Whereas the Court is reluctant to examine expert testimony regarding the proper construction of claims, the Court is pleased to entertain—indeed requires—the testimony or affidavits of some knowledgeable person with respect to the factual question of infringement (i.e. the structure of the accused device, how it operates, and in what particulars it corresponds to the claims of the patents in suit), in order to determine whether genuine issues of fact exist in this case.[6] These are appropriate questions for the trier of fact. Nothing in *Markman* requires or suggests that a court must pronounce the meaning of patent claims in a factual vacuum.

Having endeavored to clarify the procedure and analytic framework this Court has set out to follow in this case, analysis of the disputed claims may proceed.

## B. The Technology.

The summary judgment record evidences the following undisputed facts: There are hundreds of long-distance carriers in the

---

**5.** The necessity of obtaining expert assistance in certain cases does not mean that the determination reverts to a contest between partisans. Rather, this particular "mongrel practice," *Markman,* 517 U.S. 370, 116 S.Ct. at 1390, like so many others, falls into that category of issues that are decided "as matters of law are decided." *Recupero v. New England Tel. & Tel. Co.,* 118 F.3d 820, 839 (1st Cir.1997) (Keeton, J.). Among other things, this means that a court may be expected to keep its own counsel and consult its own resources in formulating its conclusion.

**6.** Rates' "Cross–Motion for Summary Judgment on Claim Construction" illustrates the difficulty

when the distinction between construction and infringement is not clearly maintained. Although denominated a motion for summary judgment under Rule 56, the document and its supporting memorandum address solely the legal question of claim construction. Rates' request for a judgment of claim construction calls for what is in essence an advisory opinion on the law without reference to a particular set of facts. The inquiry whether genuine issues of material fact exist as to claim construction is inapposite. The relevant question is whether there are factual disputes as to infringement. Rates' motion is therefore denied without further discussion.

United States alone, and each offers different rate schedules with tremendous variation among carriers. The rates of any individual carrier also vary depending upon the time of day, day of the week, and destination, among other factors. A telephone user ordinarily selects from among competing carriers by dialing an access code, which precedes the telephone number. The two patented devices together allow a telephone user to automate this selection process, providing service at optimal rates.

The North American public switched telephone network comprises a host of local telephone networks. Each network consists of individual telephones, which are connected via telecommunications lines of various types to a local central office. Each local central office is connected to long-distance telephone companies (such as AT & T, MCI, and Sprint), and thereby to other local networks.

Local telephone calls are routed through the central office along the local network. Long-distance calls, those placed to telephones beyond the local network, must be routed through a long-distance carrier. There may or may not be charges, or a choice of carriers, for both long distance and local calls. For each call, however, power to the telephone, signaling, and routing services are all provided by the local central office.

The circuitry that connects the telephone to the central office has two main purposes: signaling and transmission. Signaling functions include telling the central office when to seize a line to make a call ("supervision") and dialing the desired number ("addressing"). Transmission refers to the exchange of voice and data over the telephone network.

When the handset of the telephone is resting in the cradle or otherwise inactive, the telephone is said to be "on-hook". In the on-hook state, the local circuitry is open, and no signaling or transmission can occur. When the handset is taken off of the cradle or otherwise activated, the telephone is said to be "off-hook". When the telephone is off-hook, the local circuitry is closed, and the local office supplies both AC (alternating current) and DC (direct current) power to the telephone. DC current powers the telephone itself. AC current enables signaling and

transmission to occur. The ring signal, alerting the user to an incoming call, travels along a separate circuit, which is electrically connected to the central office regardless of the on-hook or off-hook state of the telephone.

Both the patented devices and MediaCom's PhoneMiser product are connected to the circuitry between the telephone and the local network (i.e. between the telephone and the wall jack). Both devices intercept the phone number that the user dials in order first to determine the least expensive carrier for that call and then to dial the appropriate access number to route the call through that carrier.

## DISCUSSION

Patent infringement analysis requires two separate steps. First, the court must construe the claims in order to establish their meaning and scope. Only then may the trier of fact compare the claims to the accused device in order to determine infringement. *See Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1563 (Fed.Cir. 1996). Claim construction, as distinct from infringement, is matter of law for the court to determine. *Markman*, 52 F.3d at 979.

### A. Claim Construction.

Proper claim construction is informed by three sources: the claims, the specification, and the prosecution history. *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed.Cir.1991). The language of the claim is to be given its ordinary meaning to a person having ordinary skill in the relevant art. *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1580 (Fed.Cir.1995), *cert. denied*, 517 U.S. 1167, 116 S.Ct. 1567, 134 L.Ed.2d 666 (1996).

Interpretation of the claims should be informed by the specification. *Autogiro Co. of Am. v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 398 (1967). The specification must enable a hypothetical person having ordinary skill in the art to make and use the invention, and so is typically drafted in some sense as an interpretive guide in reading the claims. While it is the claims that define the invention, the specification "is the single best

guide to the meaning of a disputed term." *Vitronics Corp., v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996).

 Finally, the court may consult the written prosecution history, or "file wrapper," to ascertain the meaning of any claim. *Graham v. John Deere Co.,* 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The prosecution history reveals evidence of the inventor's own understanding of the claimed invention and how it differs from the prior art, and may be used to confirm a construction that appears on the face of the claims.[7]

 Of the three sources, it is the claims themselves that delimit the right of the inventor to exclude others from practicing the invention. As a result, neither the specification nor the file wrapper may be used to enlarge, diminish, or vary the terms of the claims. *See Markman,* 52 F.3d at 980; *Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 227, 26 L.Ed. 149 (1880). The process of claim construction is concluded when the Court is satisfied that it has arrived at the correct understanding of the claims language, and is prepared to pronounce that meaning as matter of law. *See Markman* at 981.

 Claims phrased in purely functional terms are permitted,[8] but in construing such claims the court must look to the specification in order to identify the "corresponding structure, material, or acts" described therein. 35 U.S.C. § 112, ¶ 6;[9] *see B. Braun Medical, Inc. v. Abbott Labs.,* 124 F.3d 1419 (Fed.Cir.1997); *In re Donaldson Co., Inc.,* 16

F.3d 1189, 1195 (Fed.Cir.1994) ("If an applicant [employing a means-plus-function claim] fails to set forth an adequate disclosure [in the specification], the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112."). Reference to the specification in these instances should be understood as necessary to identify the particular structure, material, or acts claimed, but not as a substitute for construction of the claim language itself. The task of the court when construing a means-plus-function claim remains to interpret the claim.

 A device may literally infringe if it includes the structure identified in the specification (or its equivalent), but it must also perform the identical function recited in the claim itself. *See Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1388 (Fed.Cir. 1992).

 The Federal Circuit has made it clear that the use of the words "means for ____ing" in a claim element does not blindly trigger application of 35 U.S.C. § 112, ¶ 6. *Cole v. Kimberly–Clark Corp.,* 102 F.3d 524, 531 (Fed.Cir.1996). The means-plus-function analysis applies only where the claim merely recites a function without a definite structure, material, or act. If a claim uses the word "means for ____ing", but also recites a structure, material, or act, with sufficient clarity that it satisfies the particularity and distinctness requirements of 35 U.S.C. § 112, ¶ 2,[10] the means-plus-function analysis is unnecessary. The determination whether to apply the means-plus-function analysis is,

---

7. A fourth and secondary source of assistance is extrinsic evidence, such as expert and inventor testimony, learned treatises, and dictionaries. The use of extrinsic evidence is discretionary with the court, *Seattle Box Co. v. Industrial Crating & Packing, Inc.,* 731 F.2d 818, 826 (Fed.Cir. 1984), and should not be used to vary or contradict the terms used in the patent itself. Where the meaning of a term is clear and unambiguous from the intrinsic evidence, it is "legally incorrect" to rely on extrinsic evidence. *Vitronics,* 90 F.3d at 1585.

8. Such a claim is known as a "means-plus-function" claim because it recites in general terms a "means" for performing some function, but does not identify the particular feature of the claimed invention to which reference is made.

9. The Sixth paragraph of 35 U.S.C. § 112 reads:

 "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

10. The second paragraph of 35 U.S.C. § 112 reads:

 "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

thus, like other questions of claim interpretation, one for the court to make as matter of law.

Only certain of the claims are presently in dispute. In support of its summary judgment motion, MediaCom contests Rates' proposed interpretation of Claim 1 of the '085 patent and Claims 1, 11, 23, 35, and 43 of the '769 patent. As these are the only claims now at issue, the Court need not and does not construe other claims at this time. Accordingly, this analysis will proceed to examine each of the disputed claims in turn.

### 1. '085 Patent Claim 1: "means for disconnecting" and "means for generating"

Claim 1 provides for the call routing device. The claim has eight elements, two of which are in dispute. The relevant claim language recites:

> switch means operatively connected to said first jack means for disconnecting said first telephone from said network,
>
> means operatively connected to said switch means for generating a current through said switch means to the first telephone, corresponding to a current provided by said network.

The parties dispute the meaning of the word "disconnecting". MediaCom argues that the switch must completely interrupt the flow of electrical current between the network and the jack. Rates responds that a person having ordinary skill in the art would understand that the term means to disable communication signaling, but presumably to allow DC current to continue flowing through the circuit.

Although the switch means element employs "means of ___ing" language, it is not a means-plus-function claim, because it describes the structure that supports the disconnecting function (i.e. a switch or switches). *See Kimberly–Clark Corp.* at 531 ("perforation means . . . for tearing" described structure as perforations; means-plus-function provision inapplicable); *see also Greenberg v. Ethicon Endo–Surgery, Inc.,* 91 F.3d 1580, 1583 (Fed.Cir.1996) (holding that a structure expressed in functional terms might not invoke means-plus-function analysis, noting "[m]any devices take their names from the functions they perform."). Not only is the structure named, but it is described as connected to an adjacent structure, the first jack. *See Kimberly–Clark* at 531. Because this element of Claim 1 recites a definite structure, it is not a means-plus-function claim element.

Although the switch means claim element is not limited by the structure shown in the specification, the specification nevertheless informs construction of the terms in the claim. No special definition appears in the specification to indicate that the words "switch" or "disconnect" are to be understood in any way other than their ordinary meanings. *See Intellicall, Inc.,* 952 F.2d at 1388 (the inventor may act as his own lexicographer so long as the specification clearly provides any definition that differs from the ordinary meaning). The only light shed on the word "switch" is a reference to the diagram in Fig. 2. The diagram refers to the switch as "SWITCH 2 FROM C", although the written specification makes reference to a "2 Form C" switch. Col.3, Ln. 52. To multiply the confusion, Rates contends that the specification discloses the use of "*two* 'Form C' switches" rather than one. (Rates' Opp'n to MediaCom's Proposed Claim Construction, 5 [emphasis in original].)

Similarly, the specification sheds no additional light on the use of the term "disconnecting" in Claim 1. It merely offers that the switch "switches the phone off the network to the other components contained in the device." Col. 3, Lns. 52–54. No special definition appears to support Rates' interpretation of a switch that "disable[s] communication signaling," (Rates' Opp'n to MediaCom's Proposed Claim Construction, 5), rather than disconnects in the usual sense. Indeed, the specification states that the switch "connects and disconnects the phone from the network into the current source, 38, which in turn supplies a current to the phone equivalent to the current supplied by the central office of the network." Col. 3, Lns. 57–61.

Nevertheless, Rates argues that the telephone can and must remain electrically connected to the network in order for the

preferred embodiment to function properly. A construction that has the effect of excluding the preferred embodiment in the specification from coverage by the claims is "rarely, if ever, correct." *Vitronics*, 90 F.3d at 1583. Thus, in the face of a plain English reading of the terms of the Claim, Rates urges this Court to conclude that a person having ordinary skill in the art would interpret the switch means element of Claim 1 to require signaling disconnection without electrical disconnection.

The second disputed element of Claim 1 raises a related set of controversies. The parties dispute whether the claim requires an internal power source, or whether power can instead be supplied by the network itself.

As a preliminary matter, this Court construes the generating means element of the claim as a means-plus-function element because it describes no particular structure for performing the function of generating a current corresponding to a current provided by the network. The Court looks to the specification to find a description of the structure that generates current.

The specification identifies the generating means element as a " 'local CO (central office)' current source," Col. 3, Lns. 54–55, which is connected to a "power supply". Col. 4, Lns. 22–24. It is not clear whether the generating means element includes both the local CO current source and the power supply. Nor is it clear precisely what the terms " 'local CO (central office)' current source" and "power supply" signify in this context, with regard to whether the current is generated by the network or by some structure that is a part of the device itself.

Rates originally proposed to construe the current generating element as "local circuitry or equivalents that, when put in connection with the first telephone by operation of the switch means, provides power to excite or operate the telephone that substitutes for the current that would otherwise be provided by the network." (Rates' Prelim. Statement of Proposed Construction, 11.) Rates now contends, however, that the local current generator can get its power from the telephone company as well. (Rates' Surreply, 2–3.)

MediaCom argues that the claim should be limited to an internal power supply that substitutes for the power that would otherwise be supplied by the telephone network when the telephone is disconnected from the network.

It is plausible to read the Claim in various ways. It is possible to interpret the language as allowing the telephone to be switched off its direct connection to the telephone network, and onto a local power supply that is itself powered by the telephone network, as Rates contends. In the alternative, the Claim could be read strictly to limit the power supply to an internal source, such as a battery, as MediaCom contends.

It is probably more natural, however, to read the claim to allow some external means of generating current, so long as that source is not the telephone network. Otherwise, the phrase "corresponding to a current provided by said network" would make little sense. A current cannot fairly be said to correspond to another current if they are in fact the same current run through different paths. Moreover, the ordinary sense of the term "generating a current" implies the creation or initiation of electrical current, not merely passing along current from a source farther along the line.

The specification also supports the most natural reading. In Fig. 2, the switch (36) interrupts the circuit between the telephone (24) and the jack (25). The switch is in turn connected to the local CO current source (38), which is powered by the power supply (76). Thus when the switch is open, the telephone is connected to the power supply via the local CO current source; when the switch is closed, the telephone is connected to (and powered by) the network via the jack. The only way that the local CO current source can get power from the network is if the power supply itself is also connected to the network.

Reference to the prosecution history lends support to the position that the local current generator is internal to the device, or at least separate from the network. Rates argued that the invention was distinguished from prior art because it included:

an internal current source which energizes the telephone during the time when the telephone is disconnected from the network, which normally provides current for the telephone. Applicants' device includes a switch which disconnects the telephone from the network while the least cost route for a call is determined. During the period when the telephone is disconnected from the network, the internal current source of Applicants' device is connected to the telephone through the switch to energize same.

This feature is entirely lacking in [the prior art reference]. [The prior art reference] does not teach ... an internal current source which energizes the telephone when it is disconnected from the network.

Declaration of Joseph A. Capraro, Jr., Amendment '085 patent file history, Paper No.5A, p. 10, at M002832.

■ This statement is pertinent to an understanding of the literal scope of the patent claims. "Prosecution history may be used not only in an estoppel context but also as a claim construction tool." *McGill Inc. v. John Zink Co.*, 736 F.2d 666, 673, (Fed.Cir. 1984); *see also Markman,* 52 F.3d at 980. While the language is no more definitive than in the specification or claims, the patentee's own articulation of the invention during prosecution gives no indication of its special interpretation of the word disconnect.

Having examined the relevant sources, the Court, in all candor, recognizes that it is without an adequate basis in skill or knowledge of the relevant art to draw definitive conclusions at this point. Claim 1 presents questions that are sufficiently complex and technical that the Court would be remiss to impose its lay understanding on this patent claim without the benefit of expert guidance.

Particularly, the Court needs a detailed explanation of the diagram in Figure 2, including a description of what each component is and how it operates in conjunction with the others. Especially important, of course, are the switch, the local "CO" current source, and the power supply, as a person skilled in the art interprets those elements. The Court does *not* need further conclusory (and

diametrically opposing) statements regarding the *construction* of the claims.

So, what to do? In *General Electric Co. v. Joiner,* —— U.S. ——, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), the Supreme Court expressed renewed confidence in the ability of the judges of the district courts to separate the wheat from the chaff along scientific frontiers. The concurrence of Mr. Justice Breyer, *Joiner* 118 S.Ct. at 520, particularly enjoins courts to work cooperatively with the scientific community and points the way. This District has a long tradition of careful inquiry in scientific matters. *See e.g., Dow Corning Wright Corp. v. Osteonics Corp.,* 939 F.Supp. 65 (D.Mass.1996) (O'Toole, J.); *Nova Biomedical Corp. v. i-STAT Corp.,* 980 F.Supp. 614 (D.Mass., 1997) (Stearns, J.); *Fromson v. Anitec Printing Plates, Inc.,* 132 F.3d 1437 (Fed.Cir.1997).

Most recently, my colleague, Judge Richard Stearns, in *Biogen Inc. v. Amgen, Inc.,* CA No. 95–10496–RGS (D.Mass. Dec. 10, 1996), worked out an innovative, useful, and remarkably neutral and fair way to obtain and understand requisite scientific data. Judge Stearns' reliance on a technical adviser was cited with approval by Mr. Justice Breyer in his February 16th address to the American Association for the Advancement of Science, "The Interdepencence of Science and Law," at 10–11. *See* Note, *Improving Judicial Gatekeeping: Technical Advisors and Scientific Evidence,* 110 Harv. L.Rev. 941, 949–51 (1997); ABA Section on Litigation, *Civil Trial Practice Standards* 31 (1998). *But see* Damaska, *Evidence Law Adrift* 151–52 (1977). This Court adopted Judge Stearns' approach in *Amgen v. Hoechst,* CA No. 97–10814–WGY (D.Mass. Jan.27, 1998) (transcript of summary judgment motion hearing) and *Storer v. Hayes Microcomputer Products, Inc.,* CA No. 96–10602–WGY (D.Mass. Apr. 9, 1998) (transcript of hearing), considers it especially germane to its present dilemma, and reproduces his Order in *Biogen* and the scientist's undertaking there in full as Appendices A and B to this Opinion.

Here, following Judge Stearns' approach, this Court directs the parties, within thirty days of the date of this order, to agree upon

an appropriate artisan, arrange to share compensation equally, obtain from him or her the requisite undertaking, see Appendix B, and report to the Court upon all such matters. *See also Ex Parte Peterson,* 253 U.S. 300, 312, 40 S.Ct. 543, 64 L.Ed. 919 (1920); *Reilly v. United States,* 863 F.2d 149, 154–61 (1st Cir.1988). This ought not be unduly difficult. After all, Figure 2 is essentially a wiring diagram. The Court suspects that it is expressed in terms of various professional conventions. Failing such agreement, the parties shall, within forty-five days of this order, agree upon three such appropriate artisans who reflect the generally accepted range of views about these conventional matters, make the necessary arrangements, and report their doings to the Court. If, to the Court's surprise, the parties utterly fail to agree upon the existence of any qualified advisers, they shall provide a detailed report as to why (since they are presumably conversant with this area of human endeavor) they know so little about it that they cannot agree upon what persons are familiar with its basic premises. It would seem that failure to agree upon such preliminary matters will

evidence nothing more than partisanship run amok.[11] Once this Court is in a position to evaluate the information contained in the specification of the '085 patent, it will proceed to a definitive construction of Claim 1. Until that time, the motions for summary judgment with respect to the '085 patent will remain under advisement.

## 2. '769 Patent Claims 1 and 11: "predetermined time and date"

■ Claim 1 of the '796 patent relates to a method for updating the database of a call rating device that stores billing rate information for various carriers. The call rating device can be the least cost routing device described in the '085 patent, or other known call rating devices. Claim 1 includes four separate elements only one of which is in dispute. The element in dispute relates to the first step of the method, connecting to the rate provider.

connecting at a predetermined time and date via a data transfer line the call rating device to a rate provider having billing

11. The litigants will no doubt harbor misgivings about relinquishing the prerogative of deploying their own stable of experts. Their concerns are understandable enough. Indeed, at this point one can virtually hear the litigants saying, "Wait a minute, Judge. You originally said that if you got into trouble we could put forward our own experts. After all, you know we each have experts fairly slavering to tell you why one or the other of us is absolutely right."

True enough, yet on reflection this Court concludes that complex claim construction presents an ideal case for a court-selected technical advisor. Here's why.

The adversary process of adjudication is, of course, a form of representative government. *See* Christopher J. Peters, *Adjudication as Representation,* 97 Colum. L.Rev. 312 (1997) (discussing how the processes of our court system vindicate and strengthen democracy by involving litigants with standing in the explication and application of our laws). The presentation of factual issues to juries—that most vital expression of direct democracy in America today, *In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution,* 712 F.Supp. 994, 1005–06 (D.Mass.1989), *see also Development in the Law: The Civil Jury,* 110 Harv. L.Rev. 1408, 1413 (1997) (footnotes omitted)—carries with it the maximization of litigant autonomy. That is, those litigants with standing shape the litigation and ultimately determine what evidence to ad-

duce before the factfinder, and how. In this context, trial judges are reticent to intrude with additional evidentiary submissions. This may explain the desuetude into which Fed.R.Evid. 706 has fallen. *See* Joe S. Cecil & Thomas E. Willging, *Court–Appointed Experts in Reference Manual on Scientific Evidence* (Fed. Jud. Center 1994) 535, 539–40 (citing "the reluctance of judges to intrude into the adversarial process" as a principal reason for the failure to appoint an expert under Fed.R.Evid. 706).

Legal analysis, however, is not fact finding, and the technical advisor is not a source of evidence. *See Reilly,* 863 F.2d at 159. Judges, when deciding questions "as matters of law are decided," *Recupero,* 118 F.3d at 839, are free to go about it pretty much as suits them so long as they do not engage in case-specific ex parte communications. *Model Code of Judicial Conduct* Canon 3(B)(7) (1990). Litigants should understand that in securing the relative "certainty" of judicial claim construction as to the scope of a patent monopoly, they have surrendered to judges the autonomy to shape these issues themselves. In this sense, *Markman* represents a drift toward the European civil justice system of adjudication. This Court accordingly prefers the assistance of its own technical advisor to the clash of adversary presentations. The Court invites the parties to assist in the expert's selection. Should they fail, the Court will go it alone.

rate parameters for a plurality of calling stations.

Claim 11 contains the same "predetermined date and time" phrase as Claim 1. The claims specify that the connection step must be performed at a predetermined date and time. The parties dispute the meaning (or rather the significance) of the term "predetermined". MediaCom insists that, as a matter of logic and grammar, the phrase "predetermined time and date" requires that this Court identify *by whom* the time and date are predetermined. MediaCom contends that the rate provider, and not the individual user, must perform that function. Rates responds that the claim need not and does not identify who must determine the time and date of the connection, but rather allows a variety of arrangements.

The words used in the claim are simple English. The question is whether they create ambiguity in the context of this claim. MediaCom cites *Atari Games Corp. v. Nintendo of Am., Inc.*, 30 U.S.P.Q.2d 1401, 1412–13 (N.D.Cal.1993) in support of its position that the word "predetermined" is ambiguous. In *Atari* the language in question consisted of a complex series of clauses describing a "predetermined relationship" between the "execution" of one computer program and the "execution" of another. The court held that the words had no readily apparent significance in that context. In contrast, here the meaning of the phrase "predetermined time and date" yields up its meaning quite readily. On its face, the language signifies that a particular time and date must be selected substantially in advance of the connection. The language does not require that the person responsible for that selection be identified in order to give meaning to the claim.

The specification does indicate in several places that the rate provider predetermines the time and date of the connection. Those instances, however, appear in contexts that describe particular aspects or embodiments of the invention, and cannot be used to limit the claims. *See Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1303 (Fed.Cir.1997) ("While examples disclosed in the preferred embodiment may aid in the proper interpretation of a claim term, the scope of a claim is not necessarily limited by such examples.") For example, the specification states that "[t]he rate provider has the intelligent capability" to determine call-in times, a capability that is essential "in a large network." Col. 5, Lns. 6–10. This capability appears to be an advantage in large networks because staggering the calls from subscribers helps to prevent network overload that would occur if a large number of stations called in at once. *Id.* It does not appear necessary, however, that the rate provider must schedule the call-in times in smaller networks, for example.

Similarly, in the context of a pay-telephone calling station, the specification calls for connection via a toll number at a time "set by the rate provider." Col. 4, Lns. 23–25. But this aspect of the invention is specifically directed to an automatic billing arrangement for use with pay-telephones, which would not be suited to predetermination of the call-in times by the user of the telephone.

Finally, MediaCom points to the prosecution history to show that Rates urged predetermination by the rate provider as an advantage over prior art references. Indeed, the prosecution history contains the strongest support for MediaCom's position. It is true that in several instances Rates argued that its invention was not anticipated by earlier inventions specifically because it updates the database automatically, at times established *by the rate provider*, and does not require initiation by the user. The interpretation now advanced by Rates, however, is not precluded by its conduct of the patent prosecution. The factor that distinguished the '769 patent claims over the prior art was that each prior art reference required initiation by the user each time an update was desired. In contrast, Rates claimed an invention that did not require such initiation; indeed, the '769 device could update its database at predetermined dates and times. It would be a different matter if Rates had advanced a distinction between user initiated connection and provider initiated connection, but such was not the case. Rather, the critical distinction was between user initiated connection and predetermined or scheduled connection. *See* Capraro Decl., '769 patent file

history, Amendment, Paper No. 7, p. 3–4, at M002689–90; Amendment, Paper No. 12, p. 1–2, at M002714–15; Amendment, Paper No. 15, p. 8, ¶ 3, at M002739; Notice of Allowablility, Paper No. 16, p. 2–3, at M002744–45.

In the context of claim construction, the prosecution history, like the specification, is merely an aid to interpreting the language of a claim. In this case, reference to the prosecution history does not clearly overwhelm the ordinary meaning attached to the words of the claim, nor does the prosecution history indicate that Rates so limited its claim to obtain the patent that its current position is now precluded. Because the claim itself speaks clearly and unambiguously, this Court need not import terms from the remainder of the patent record to identify who determines the time and date for connection. To do so impermissibly allows statements in the prosecution history to diminish the scope of the claims. *See Markman* 52 F.3d at 980. Claims 1 and 11 therefore encompass a method in which the time and date for calling the rate provider are selected a substantial period in advance of the call, and in which each call to the rate provider need not be initiated by the individual user.

### 3. '769 Patent Claim 23: "scheduled time"

■ Claim 23 similarly describes the method of updating subscriber databases. The claim contains four elements, only the first of which is in dispute.

> Each subscriber station calling at a scheduled time a rate provider having billing rate parameters for each calling station, wherein the scheduled time for each call is such that the calls from each calling station are substantially spaced apart from each other.

Unlike Claims 1 and 11, Claim 23 uses the term "scheduled time" rather than "predetermined date and time" to limit contact between the calling station and the rate provider. Contact must be scheduled, according to the claim, so that calls are "substantially spaced apart in time from each other." Neither party raises an argument that this distinct language should have a distinct meaning. Rates and MediaCom each insist that

"scheduled time" has a meaning equivalent to "predetermined date and time".

■ Notwithstanding the parties' positions, different usages in different claims are presumed to have different meanings. *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed.Cir.1987). Because Claim 23 uses a different term, and imposes the additional requirement that calls be spaced apart, this Court must ascertain the meaning of this language. The specification explains that the spacing of calls is advantageous because it prevents the calling stations from overloading the rate provider by calling in all at once. It is difficult to conceive of any way to ensure that calls from numerous calling stations are spaced apart from each other without central direction. If individual calling stations independently were to select times to call in, even if they selected those times far in advance, there would seem to be no way to eliminate the possibility, however remote, of overloading the rate provider.

Rates argues that, even if individual users set their own call-in schedules, those decisions would be random and independent of one another, and so satisfy the requirement that the calls be scheduled so that they are spaced apart. That is an argument properly addressed to factual questions of infringement, and not claim construction. It suffices to construe Claim 23 to encompass a method in which the time for calling the rate provider is determined and planned in such a way as to ensure that there are substantial intervals of time between each call received by the rate provider from all users.

### 4. '769 Patent Claim 1, 11, 23, 35, 43: "updated billing rate parameters"

■ Claim 35 describes the apparatus for updating the call rating device. The claim includes four elements; only one sub-element of the fourth element is in dispute.

> "means transmitting from the rate provider to the call rating device the updated billing rate parameters when the rate provider determines that an update is required."

The parties dispute the meaning of the term "updated billing rate parameters." The term

"updated billing rate parameters" appears in Claims 1, 11, 23 and 43 as well, and has the same meaning as it has in Claim 35.[12]

According to the claim, the apparatus would be required to transmit "from the rate provider to the call rating device the updated billing rate parameters." MediaCom contends that the term should be construed to require transmission of entire new rate tables whenever the rate provider determines that an update is proper. Rates maintains that the claim requires modifications to the database of the call rating device in order to make current the information stored there, but does not require transmission of entire new rate tables.

The meaning of the disputed term is not obvious from the context of the claim. The specification explains that "billing rate parameters could include the rates for local and long distance calls, and the rates of various carriers in some instances." Col. 3, Lns. 19–21. The billing rate parameters are compiled in a "rate table" that is stored in the "current rate table storage" and the separate "new rate table storage" components of the call rating device. Col. 3, Lns. 24–31. Similarly, the rate provider stores billing rate parameters in a (typically larger) "rate table storage" device. There is no question that the billing rate parameters are stored in the form of tables, as MediaCom argues.

The specification does not say, however, that the information is *transmitted* in the form of tables, as MediaCom urges the Court to conclude. MediaCom points to Col. 4, Lns. 58–59, "[t]he rate table is replaced (block 105) if changes are required." This language reveals that the new table entirely replaces the current table *within* the call rating device once the new table becomes effective.[13] It does not reveal, however, how the data are transmitted from the rate pro-

vider to the call rating device in the first instance. Similarly, the specification refers to a "newer rate table" becoming available within the rate provider device, Col. 6, Lns. 19–20, but does not discuss transmission. The only discussion concerning transmission of billing parameters refers to a "block of data" or "block of information" being retrieved and sent. Col. 5, Ln. 11, 28; Col. 6, Lns. 2–19. The specification contemplates that an update might require the transmission of more than one such block, based on a determination of whether more data is needed to update the database. Col. 6, Lns. 6–19. Absent some other clear indication in the specification, there is no reason to conclude that the "updated billing rate parameters" must be transmitted in the form of complete rate tables. Thus the claims encompass transmission of the complete new tables, or, in the alternative, additions, deletions, or modifications to the existing rate tables.

## B. Infringement.

The first labor completed, the second now begins. As the issue of infringement arises on cross motions for summary judgment, this Court must determine whether there remain genuine issues of material fact on the question of infringement of the '085 and '769 patents as they are now construed, and whether MediaCom is entitled to judgment. Fed.R.Civ.P. 56. A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 490, 112

12. No particular or definite means for transmitting is described by this language. The element is therefore a "means-plus-function" claim governed by paragraph 6 of section 112. The only part of the claim that is actually limited by the specification, however, is the means itself. The function that the means performs is fully described in the claim itself. The function of the claim is therefore not limited by the specification, although the specification is a useful aid in interpreting the claim.

13. The reason two storage areas are required within the call rating device is that new billing information may become available before the new rates actually go into effect. By using two different tables, the device can be updated as soon as the new rates are publicized, but continue to refer to the old rates as long as they remain in effect.

S.Ct. 2072, 119 L.Ed.2d 265 (1992) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505).

▮ The accused device or method must embody each and every element of a claim, either literally or under the doctrine of equivalents, in order to infringe on that claim. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 117 S.Ct. 1040, 1054, 137 L.Ed.2d 146 (1997); *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538–39 (Fed.Cir.1991) (quoting *Lemelson v. United States,* 752 F.2d 1538, 1551 [Fed. Cir.1985] ). Even if an element of the accused device or method does not satisfy the patent claim literally, it may infringe under the doctrine of equivalents if it performs the same function, in the same way, to produce the same result as the claim element. *See Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 934–35 (Fed.Cir.1987) (en banc); *Warner–Jenkinson,* 520 U.S. at ——, 117 S.Ct. at 1054 (directing attention to "the role played by each element in the context of the specific patent claim").

Having reserved the question of infringement on the '085 patent, the Court proceeds directly to the '769 patent. Because the parties have directed the bulk of their arguments to questions of claim construction, there is comparatively little dispute as to factual matters. The only task remaining is to apply the patent claims as construed by the Court to the PhoneMiser product in order to determine whether MediaCom is entitled to judgment.

**1. Infringement of Claims 1 and 11**

▮ There is no dispute about the operation of the PhoneMiser product with respect to Claims 1 and 11. According to Robert L. Pokress, Chairman and Chief Executive Officer of MediaCom, and one of the designers of the PhoneMiser product,

> the PhoneMiser software initially uses the date that the user decides to load the software onto the PC as the first date to place a call to the central server. Thereafter, the update routine can automatically place a new call thirty days from the most recent update. In addition, the user can, at will, manually direct the update routine to place the telephone call more frequent-

ly. After placing such a call, the update routine within the PhoneMiser software in the PC resets itself in its default mode to request another update thirty days from the most recent update.

Declaration of Robert L. Pokress ¶ 12 ("Pokress Decl.") Rates embraces this description, and neither party offers any contrary description of the accused product's operation or structure.

Under this Court's construction of the relevant claims, the accused product must embody a method of placing calls wherein the determination of the time and date of the call is made substantially in advance, and the user need not initiate the call at the time it is to be made. There is sufficient evidence to support the inference that the PhoneMiser product does embody these limitations, and therefore infringes as to this element. Thirty days in advance is sufficiently ahead of time to be called predetermined, and although the user may initiate calls, she need not. Update calls will be made regularly without any intervention by the user. Since a reasonable trier of fact might find infringement, summary judgment of noninfringement for MediaCom Claims 1 and 11 must be denied.

**2. Infringement of Claim 23**

▮ Although Claim 23 carries a slightly different limitation, Mr. Pokress's account of the operation of the PhoneMiser remains the relevant text. Claim 23 requires that the accused device place calls that are planned in such a way as to ensure that there are substantial intervals of time between each call received by the rate provider from all users. Rates argues that, even though there is no central control over scheduling, the PhoneMiser systematically assures that calls will be placed at acceptable intervals. Rates introduces the concept of "load balancing", the use of randomness to prevent excessive transactions at any given time. Because the initial use of the PhoneMiser by individual users would be determined independently and at random, the load on the system would be balanced and the spacing of calls would be assured as a matter of probability. Declara-

tion of Stephen K. Burns, Ph.D. ¶ 52. ("Burns Decl.") Rates asserts that "load balancing" is a well understood and acceptable method of controlling calls, and that a person having skill in the art would understand this method as satisfying the scheduling element of Claim 23. *Id.*

Whether or not "load balancing" is a sufficient mechanism to achieve substantial spacing of calls is a question of fact. If the trier of fact were to credit Rates' assertions concerning the operation of the PhoneMiser product, it could on that basis draw a conclusion of infringement. Rates has thus demonstrated the presence of a genuine issue of material fact, and MediaCom's motion for summary judgment of noninfringement of Claim 23 must be denied.

### 3. Infringement of Claims 1, 11, 23, 35, and 43

 Finally, Claims 1, 11, 23, 35, and 43 all recite the transmission of "updated billing rate parameters" from the rate provider to the user. The PhoneMiser "compiles the rate changes for the user's customized database in response to the request and downloads only the changes needed for the user's database." Pokress Decl. ¶ 13. The "central server provides only rate changes, not complete new rate tables." *Id.*

Under this Court's construction of the Claims, the accused device may transmit updated billing rate parameters in the form of complete new tables, or modifications to existing rate tables. On the record before the Court, the trier of fact could find infringement since transmission of "rate changes" could reasonably be seen to satisfy the updating element. Therefore, summary judgment of noninfringement by MediaCom must again be denied.

### CONCLUSION

As to the '085 patent claims, the motion for summary judgment of noninfringement remains under advisement. The parties are invited to propose a candidate or candidates to serve as the Court's technical advisor on the technology underlying those claims.

As to the '769 patent, MediaCom has failed to demonstrate that it is entitled to a judgment of noninfringement. Based on the claims as herein construed, the trier of fact could reasonably find infringement on each of the three elements that MediaCom has advanced. The motion for summary judgment as to the '769 patent is therefore denied.

### APPENDIX A

### UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NUMBER 95–10496–RGS

### BIOGEN, INC.

v.

### AMGEN, INC.

### MEMORANDUM AND ORDER FOR THE ENGAGEMENT OF DR. JONATHAN L. TILLY AS TECHNICAL ADVISOR

### December 10, 1996

Stearns, D.J.

On November 7, 1996, during an *in camera* conference, the court notified the parties of its proposal to appoint a technical advisor in this action, Dr. Jonathan L. Tilly, and discussed his intended role. Subsequently, the court provided the parties with Dr. Tilly's curriculum vitae, and invited their written comments. Having considered the comments of the parties, the court pursuant to its inherent authority appoints Dr. Tilly as its technical advisor in this action, according to the terms and conditions set forth below. The court does so because of its conviction that this case in its scientific complexity is one of those rare "extraordinary cases where the introduction of outside skills and expertise, not possessed by the judge, will hasten the just adjudication of a dispute without dislodging the delicate balance of the juristic role." *Reilly v. United States,* 863 F.2d 149, 156 (1st Cir.1988).

Dr. Tilly shall as the court's technical advisor assist the court in educating itself in the terminology and theory disclosed by the evidence as the court deems necessary. He will act as a sounding board for the court's

assessment of the scientific significance of the evidence, and he will assist the court in determining the validity of any scientific evidence, hypothesis or theory on which the experts base their testimony. In so doing, Dr. Tilly will function as a confidential advisor to the court analogous to the role performed by a judicial clerk. Dr. Tilly will not be called upon to testify. He will not act as a finder of fact nor will he attempt to advise the court on any matter of law.

In accepting this engagement, Dr. Tilly has affirmed to the court that he is a neutral third party in regard to this action, that he has no ideological, financial or professional interest in the outcome of the litigation, and that he will respond to questions concerning technical or scientific terminology or theory in a manner consistent with his best understanding of relevant, generally accepted scientific knowledge. Dr. Tilly further has affirmed that he has never had, does not presently have, and does not anticipate entering into any future financial, business or personal relationship with either litigant, including stock ownership, grant money, consulting contracts or employment, and will not do so while this action is pending. Nor will he use or seek to benefit from any confidential information that he may acquire in the course of this employment. Dr. Tilly also has affirmed that he has no financial, business or personal relationship with any of the witnesses identified in the Rule 26(a)(1) initial disclosures of Biogen and Amgen, which are attached to this Order.

Should Dr. Tilly become aware of any conflict or potential conflict, he has agreed to inform the court immediately. In such event, the court will inform the parties, and either seek their comments or terminate Dr. Tilly's engagement *sua sponte.*

Dr. Tilly has agreed that his communications with the court and any information shown or provided to him by the court in connection with this litigation are to be treated as confidential. This requirement of confidentiality shall not apply to the fact of his engagement, the amount of any compensation he is paid, information available in public records, or any other matter specified in

writing by the court. Dr. Tilly has further agreed that he will not engage in any independent investigation of the underlying litigation, provide evidence to the court, or contact any party or witness in this action. The court will identify for the parties any materials used by Dr. Tilly in providing advice to the court other than those submitted by the parties or those upon which a person versed in the relevant field of knowledge would be reasonably expected to rely. The parties, including their experts and consultants, are ordered not to have any communication with Dr. Tilly except in the presence of the court. Should any party contact Dr. Tilly (except to provide payment as set forth below), or should any person seek to communicate with him about the substantive issues involved in this litigation, he will inform the court immediately of all facts and circumstances concerning such contact.

The parties have been advised that, consistent with the nature of his engagement, the court anticipates having direct *ex parte* communications with Dr. Tilly. Should the court, however, ask Dr. Tilly to prepare any written submission for the court, a copy of any such submission will be provided to the parties (except written comments by Dr. Tilly on drafts of the court's own opinions). Should either party believe that any such written submission contains errors of fact, that party may so advise the court in writing.

Dr. Tilly shall keep track of his time and submit a monthly statement to the court showing the hours expended. The parties are each directed to pay one-half of Dr. Tilly's compensation, at a total rate of $175 per hour for time spent reviewing materials at the court's request, and a total rate of $225 per hour for time spent in providing direct consultation to the court. Payments shall be made within 45 days after receipt by the parties of copies of Dr. Tilly's billing statements approved by the court. The court taxes such costs to the parties pursuant to its inherent power to do so in the interest of promoting the efficient conduct of this complex litigation. See *Two Appeals (San Juan Dupont Plaza Hotel Fire Litig.),* 994 F.2d 956 (1st Cir.1993).

Dr. Tilly will execute an affidavit indicating his understanding of this Order prior to beginning his engagement. He will at the conclusion of his employment file an affidavit attesting to his compliance with the terms of this Order.

SO ORDERED.

Richard G. Stearns

UNITED STATES DISTRICT JUDGE

## APPENDIX B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NUMBER 95–10496–RGS

BIOGEN, INC.

v.

AMGEN, INC.

AFFIDAVIT OF ENGAGEMENT

December 10, 1996

I, Dr. Jonathan Lee Tilly, declare under penalty of perjury under the laws of the United States as follows:

1. I agree to act as the court's technical advisor in this action. I will assist the court in educating itself in the terminology and theory disclosed by the evidence as the court deems necessary. I will act as a sounding board for the court to think through the scientific significance of the evidence, and will assist the court in determining the validity of any scientific evidence, hypothesis or theory on which the experts base their testimony. In so doing, I will to the best of my ability respond in a manner consistent with generally accepted knowledge in the relevant area.

2. I understand and agree that I am not to engage in any independent investigation of the litigation, provide evidence to the court, or contact any party or witness in this action.

3. I hereby certify that I have read and that I understand the terms of the Stipulated Protective Order ("Protective Order") between Biogen, Inc., and Amgen Inc., and agree to be bound by its terms. I understand and agree that my communications with the court on this matter and any information shown or provided to me by the court are to be treated as confidential. I understand that this requirement of confidentiality shall not apply to the fact of my engagement, the amount of compensation I receive, information available to me from public records, or any matter otherwise specified in writing by the court.

4. I affirm that the Curriculum Vitae provided by me to the court was accurate and complete in all material respects.

5. I affirm that I am a neutral third party in regard to this action, with no ideological, financial or professional interest in the outcome of the litigation.

6. I affirm that I have never had, nor presently have, nor anticipate in the future having any financial, business or personal relationship with either party, including stock ownership, grant money, consulting or employment.

7. I affirm that I have no financial, business or personal relationship with any of the witnesses identified in the Rule 26(a)(1) initial disclosures of Biogen and Amgen.

8. I agree that I will not acquire any stock in either party until final resolution of this action, nor use or seek to benefit from any confidential information I may acquire in the course of this engagement.

9. I understand and agree that if I become aware of any conflict or potential conflict, including any grant money or other compensation going to Vincent Memorial Hospital, my current employer from either party, that I am to inform the court immediately.

10. I understand and agree that should any party contact me (except to provide payment as set forth in the Order), or should any person seek to communicate with me about any substantive issue in this litigation, I will inform the court immediately of all facts and circumstances concerning such contact.

11. I agree to keep accurate records of my time and submit a monthly statement for the court's approval showing the hours I

have expended on matters referred to me by the court.

Executed this 10th day of December 1996.

/s/ Jonathan Lee Tilly
JONATHAN LEE TILLY